IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



ABDUL Y. KOROMA,

    Plaintiff,

v.                       Civil Action No. 3:09cv736

RICHMOND REDEVELOPMENT
& HOUSING AUTHORITY,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT (Docket No. 15). For the reasons set forth below, the Motion will be granted.

## BACKGROUND

In this action, Plaintiff, Abdul Y. Koroma ("Koroma"), complains that Defendant, Richmond Redevelopment & Housing Authority ("RRHA"), violated his rights when it refused to absorb his Section 8 Housing Choice Voucher ("voucher"). (Am. Compl. ¶¶ 1-2.) The Section 8 Housing Choice Voucher Program ("HCVP") provides rental assistance to low-income families in the private rental market.[1] (Id. ¶ 12.)

---

[1] Koroma is a participant in this program. (Id. ¶ 24.) Koroma and his wife are currently unemployed; they participate in a state-run program that provides job assistance and training. (Id. ¶ 54.) Additionally, Koroma volunteers three times a week at Goodwill. (Id.)

## I.   Statutory and Regulatory Overview

The HCVP was created by Congress under 42 U.S.C. § 1437f(o) and is governed by regulations promulgated by the U.S. Department of Housing and Urban Development ("HUD"), 24 C.F.R. pt. 982. Qualified families pay approximately thirty percent of their income to rent and utilities and receive subsidies for the balance of the rental payment. (Id. ¶ 14); 42 U.S.C. § 1437f(o)(2)(A). RRHA is the local public housing authority ("PHA") that administers the HCVP for Richmond and the surrounding area. (Am. Compl. ¶ 9.) RRHA "is a political subdivision of the Commonwealth of Virginia." (Id. (citing Va. Code § 36-4).)

A participant-family's eligibility for the HCVP is determined by income. 24 C.F.R. § 982.201. Once a PHA determines that a participant-family is eligible and that there is available space in the program, the PHA issues the participant a voucher. Id. §§ 982.202, .302. The voucher allows the family to search for housing within the jurisdiction of the PHA that issued the voucher. See id. § 982.302(a). In addition, 42 U.S.C. § 1437f(r), along with 24 C.F.R. § 982.355, provides that a family may move, or port, its voucher from one geographical area to another, if certain conditions are met and if funding is available.

When a participant wishes to port his voucher, he must notify the initial PHA. U.S. Dept. of Hous. & Urban Dev., Notice PIH 2008-43, Housing Choice Voucher Portability Procedures and Corrective Actions 5 (2008) [hereinafter 2008 HUD Notice]. The initial PHA is the PHA that is currently funding the voucher. Id. § 982.4(b). After a family notifies the initial PHA that it wishes to move to another jurisdiction, the initial PHA contacts the receiving PHA that the family desires to post its voucher. 2008 HUD Notice 5. The receiving PHA is the PHA in the jurisdiction into which the family wishes to move. See id. § 982.4(b).

The initial PHA then completes the top part of Form HUD-52665 and sends it to the receiving PHA. 2008 HUD Notice 5; see U.S. Dept. of Hous. & Urban Dev., form HUD-52665, Family Portability Information 1 (2004) [hereinafter Form HUD-52665]. The receiving PHA has the option either to absorb the family's voucher into its program thereby assuming the cost of providing the government subsidy or to bill the initial PHA for the cost of the voucher and a portion of the administrative fees, depending on the funds it has available. 24 C.F.R. § 982.355(c)(5), (e)(1). Absorption occurs when, after the receiving PHA inspects the proposed rental property selected by the participant, the PHA executes a housing assistance program ("HAP") contract with the lessor. At that time, "a receiving

PHA stops billing the initial PHA for assistance on behalf of a portability family" and starts using funds from the receiving PHA's budget.  Id. § 982.4(b).

The receiving PHA does not re-determine eligibility of the incoming family.  Instead, it issues a voucher to the participant-family to search for housing in its jurisdiction ("search voucher").  2008 HUD Notice 5, 6.  That allows the family to locate housing for the receiving PHA to consider, but issuance of a search voucher does not constitute absorption of the actual housing voucher by the receiving PHA.  In other words, the search voucher is but a preliminary step in the port process.  Once the family locates a suitable unit, it must request the receiving PHA to approve the tenancy.  24 C.F.R. § 982.302(b).  If, after inspecting the premises, the receiving PHA approves the tenancy and the unit, then the PHA will enter into a HAP contract with the owner of the property.  24 C.F.R. §§ 982.305 and 451.

However, a PHA cannot approve a unit or execute a HAP contract until it is determined that: "(1) The unit is eligible; (2) The unit has been inspected by the PHA and passes [Housing Quality Standards]; (3) The lease includes the tenancy addendum; (5) The rent to owner is reasonable; and (5) At the time a family initially receives tenant-based assistance for occupancy of a dwelling unit, and where the gross rent of the unit exceeds

4

the applicable payment standards for the family, the family share does not exceed 40 percent of the family's monthly adjusted income." Id. § 982.305(a). A HAP contract must be executed before any housing assistance payments can be made on behalf of the family. Therefore, a receiving PHA cannot absorb the family until a HAP contract has been executed.[2] 2008 HUD Notice 7.

Because of the importance of the HAP contract as the trigger for the making of housing assistance payments, when a PHA issues search vouchers to participants, it warns them to not enter into a lease until the tenancy has been approved and a HAP contract executed. 24 C.F.R. § 982.301. Additionally, the search voucher itself contains such a warning:

> When issuing this voucher the PHA expects that if the family finds an approvable unit, the PHA will have the money available to enter into a HAP contract with the owner. However, the PHA is under no obligation to the family, to any owner, or to any other person, to approve a tenancy.

(Def.'s Reply Mot. to Dismiss Ex. B at 1 [hereinafter Def.'s Reply]; Def.'s Reply Ex. C at 1); e.g., U.S. Dept. of Hous. &

---

[2]     A PHA does not technically "absorb" a family into its program until the receiving PHA executes a HAP contract on behalf of the family in the receiving PHA jurisdiction. . . . If the family is not placed under HAP contract in the receiving PHA jurisdiction, the receiving PHA cannot absorb the family.

(Am. Compl. Ex. 1 at 7); accord 2008 HUD Notice 7.

Urban Dev., form HUD-52646, Voucher 1 (2010) [hereinafter Form

HUD-52646].  Until a HAP contract is executed, "a PHA is [not]

legally obligated to make HAP payments."[3]  See 2008 HUD Notice 4.

Within ten days of the execution of the HAP contract, the

receiving PHA must return Part II of Form HUD-52665 to the

initial PHA.  Id. at 7.  At that time, the receiving PHA informs

the initial PHA of its intention either to absorb the

participant-family's voucher or to bill the initial PHA.  Id.

If a receiving PHA chooses not to absorb the voucher and,

instead, submits the billing request, the initial PHA must

accept billing.  24 C.F.R. § 982.314(e)(1).  However, an initial

PHA is permitted to deny a family's request to port its voucher

into a more expensive jurisdiction if the initial PHA does not

have enough funds for continued assistance.  Id. § 982.314(e)(1).

## II. Factual Background

The Amended Complaint asserts five claims[4] against RRHA:

Count One alleges a violation of Koroma's rights under the

Housing Act of 1937 Voucher Portability Provisions, 42 U.S.C. §

---

[3]     Additionally, because a PHA is not obligated to pay housing
assistance payments until a HAP contract is executed,
outstanding search vouchers are not considered when a PHA
determines whether it has sufficient funds to accept billing or
to absorb a family's voucher.  2008 HUD Notice 4.

[4]     The Amended Complaint uses the terminology "First Claim,"
etc.  This opinion will refer to the claims as numbered counts
(e.g. Count One, etc.).

1437f(r), and actionable under 42 U.S.C. § 1983. Count Two alleges a violation of Koroma's rights under the Housing Act of 1937, 42 U.S.C. § 1437f, and the Brooke Amendment, 42 U.S.C. § 1437a, and actionable under 42 U.S.C. § 1983. Count Three alleges an unconstitutional denial of Due Process under the Fourteenth Amendment of the U.S. Constitution. Count Four alleges a violation of the federal common law of promissory estoppel. Count Five alleges a violation of Koroma's rights under the Constitution of Virginia, Article 1, Section 11. (Am. Compl. ¶¶ 58-69.) The facts are as set forth in the Amended Complaint and the documents referred to therein.

Originally, Koroma received benefits from Columbia County Housing Authority ("CCHA") in Berwick, Pennsylvania.[5] (Id. ¶ 25.) In 2009, Koroma decided to move to Virginia to be closer to his family and increase his job prospects. (Id. ¶ 26.)

In June 2009, Koroma and CCHA communicated with RRHA about the possibility of Koroma transferring his housing voucher to RRHA.[6] (See id. ¶¶ 29-30.) In a June 30, 2009 letter to CCHA, RRHA stated that it planned to "'[a]bsorb all [p]ortability [r]equests' submitted before October 1, 2009." (Id. ¶ 30; Am. Compl. Ex. 3.) Upon receiving this letter, CCHA sent RRHA a Family Portability Information Form, Form HUD-52665, stating

---

[5]    CCHA is the initial PHA.

[6]    RRHA is the receiving PHA.

Koroma's eligibility and referencing RRHA's June 30th letter. (Am. Compl. Ex. 5; Am. Compl. ¶ 38.)

In a July 7, 2009 letter, CCHA informed Koroma that his rent assistance would be terminated on July 31, 2009, because he was porting his voucher to RRHA. (Am. Compl. Ex. 4; see Am. Compl. ¶ 32.) CCHA also informed Koroma of his right to a hearing in this letter. (Am. Compl. Ex. 4.) CCHA subsequently issued Koroma a search voucher on August 1, 2009 that was valid until September 30, 2009. (Am. Compl. ¶ 39.) In August 2009, RRHA converted the search voucher issued by CCHA to a RRHA search voucher for the same time period. (Id. ¶ 40.)

On August 17, 2009, after Koroma located a suitable housing unit in Chester, Virginia, he submitted a Request for Tenancy Form to RRHA. (Id. ¶ 41.) On August 27, 2009, RRHA conditionally approved his tenancy; however, before inspecting the premises and before execution of a HAP contract, RRHA stopped absorbing vouchers because of funding shortfalls.[7] (Id. ¶¶ 41-42.) On September 11, 2009, RRHA requested that CCHA accept billing for Koroma's voucher. (Id. ¶ 42.) Three days

---

[7]    Both the Amended Complaint and a letter sent to CCHA from RRHA state Koroma's "Request for Tenancy Approval" was approved. (Am. Compl. ¶ 41; Am. Compl. Ex. 6.) However, according to regulations, a participant cannot be approved until, among other things, the unit is inspected. 24 C.F.R. § 982.305(a). Therefore, the approval the parties refer to was a determination of conditional approval RRHA makes prior to forwarding a unit to be inspected.

later, CCHA informed RRHA it would not accept billing. (Id.)
On September 21, 2009, Koroma was informed that RRHA would not
be able to absorb his voucher. (Id.) RRHA recommended that he
return to Pennsylvania where his original voucher could be
reinstated. (Id. ¶ 43.) Koroma, however, elected to stay in
Virginia and not return to Pennsylvania. (Id. ¶¶ 51-55.) RRHA
never inspected the unit he proposed to rent nor did it execute
a HAP contract on behalf of Koroma. (Am. Compl. ¶ 44; see Pl.'s
Mem. In Opp'n Mot. To Dismiss 24 [hereinafter Pl.'s Opp'n].)

On November 6, 2009, Koroma's landlord demanded $3.549.00
in rent, and advised that Koroma and his family would face
eviction if the rent was not paid. (Am. Compl. ¶ 51.) Koroma
was then served with an unlawful detainer notice in Chesterfield
County General District Court on December 2, 2009 for $4485.25
in unpaid rent, late fees, costs, and attorneys' fees. (Id. ¶
52.) Five days later, Koroma's landlord delivered a notice
requesting $4,599.00 in rent, late fees, and costs. (Id.)
Subsequently, judgment was entered in favor of the landlord and
Koroma was evicted. This action ensued, and RRHA filed a Motion
to Dismiss Plaintiff's Amended Complaint (Docket No. 15) seeking
the dismissal of all counts alleged in the Amended Complaint,
pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 15
(a)(3).

9

## DISCUSSION

### I. The Legal Standard

A motion to dismiss under Rule 12(b)(6) seeks to test the legal sufficiency of the factual allegations made in the complaint. The Court must take all factual allegations made in the complaint as true, and must draw all reasonable and favorable inferences from those facts. <u>Eastern Shore Markets, Inc v. JD Assocs. Ltd. P'ship</u>, 213 F.3d 175, 180 (4th Cir. 2000). To survive a motion to dismiss, the complaint must state the grounds of its entitlement to relief, which requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal quotations omitted). Furthermore, the facts, as they are pled, must raise the right to recovery above the speculative level. <u>Id.</u> Thus, the complaint must allege enough facts to state a claim for relief that is plausible on its face. <u>Id.</u> at 570; accord <u>Giarratano v. Johnson</u>, 521 F.3d 298, 302 (4th Cir. 2008).

Ordinarily, a court may not consider any documents that are outside of the complaint in deciding a motion to dismiss, without converting the motion into one for summary judgment. <u>Witthohn v. Fed. Ins. Co.</u>, 164 F. App'x 395, 396 (4th Cir. 2006). Nevertheless, a court may consider official public records, documents central to a plaintiff's claim, and documents

10

sufficiently referred to in the complaint without converting the motion to dismiss into one for summary judgment, so long as the authenticity of such documents is not disputed. *Id.*; *see also* *Gasner v. Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) (permitting the judicial notice of public documents, such as court records, even when the documents are neither referenced by nor integral to the plaintiff's complaint). Accordingly, documents of that sort will be considered insofar as they are relevant to the disposition of RRHA's Motion to Dismiss Plaintiff's Amended Complaint.

## II. Count One: The Housing Act of 1937 Voucher Portability Provisions.

In Count One, Koroma asserts that RRHA violated his rights under the Housing Act of 1937, specifically the portability provisions, 42 U.S.C. § 1437f(r), and that the violation is actionable under 42 U.S.C. § 1983. (Am. Compl. ¶¶ 58-59, 63.) However, as explained below, the portability provisions of the Housing Act do not create a private right of action. Therefore, Count One fails to state a claim upon which relief can be granted.

Of course, § 1983 confers no substantive rights. Rather, it provides a procedural vehicle for the bringing of suits to enforce federal constitutional or statutory rights. *See* *id.* at 285. Further, § 1983 only provides a remedy for "rights, not

[for] the broader or vaguer `benefits' or `interests'"
conferred by a statute. <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 283
(2002).

Typically, a showing of congressional intent to create a
private right of action in a federal rights-conferring statute
permits an individual to sue under § 1983 to redress a violation
of the substantive right. <u>Id.</u> at 283. However, "the text and
structure of the statute" must show that Congress intended to
create private rights to sue under the statute. <u>Id.</u> at 286.
And, the intent of Congress must establish an "unambiguously
conferred right." <u>Id.</u> at 283.

In order for a violation of a federal right to be
enforceable under § 1983: (1) Congress must have intended the
statutory provision creating the right to benefit the plaintiff,
(2) the right must not be "vague and amorphous" as to strain
judicial competence, and (3) the provision must be in mandatory,
not precatory, terms. <u>Blessing v. Freestone</u>, 520 U.S. 329, 340-
41 (1997). With these factors present and an unambiguously
stated Congressional intent to create a private right, the court
should find an actionable private right. <u>Gonzaga</u>, 536 U.S. at
283-85.

Koroma argues that the plain language of the portability
provision of the Housing Act, 42 U.S.C. § 1437f(r)(1)(A),

creates rights that benefit him. (Pl.'s Opp'n 10.) Koroma

relies on the following provision in the statute:

> "Any family receiving tenant-based
> assistance under subsection (o) of this
> section may receive such assistance to rent
> an eligible dwelling unit if the dwelling
> unit to which the family moves is within any
> area in which a program is being
> administered under this section."

42 U.S.C. § 1437f(r)(1)(A) (emphasis added). In Kirby v.

Richmond Redevelopment & Housing Authority, the Court held that

no private right of action existed for Section 8 voucher

participants under 42 U.S.C. § 1437f. 2005 U.S. Dist. LEXIS

43547, at *24 (E.D. Va. 2005), adopted at 2005 U.S. Dist. LEXIS

43546 (E.D. Va. 2005), affirmed by 194 F. App'x 105 (4th Cir.

2006). While Kirby dealt with housing quality standards under

42 U.S.C. § 1437f(e), the principles of Kirby apply with equal

force to the portability provision in § 1437(f) on which Koroma

relies. Id. at *23-24 ("Moreover, the remainder of § 1437f

evinces a [c]ongressional focus on regulating the Secretary of

HUD.").

In response, Koroma argues that the finding in Kirby that

there is no private right of action in 42 U.S.C. § 1437f is

dicta because it was not necessary to decide case. (Pl.'s Opp'n

8-9.) Additionally, he says that Kirby is not consistent with

the more complex analysis called for in Gonzaga. (Id. at 8.)

However, when analyzed under _Gonzaga_, the statute here at issue rather clearly must be construed not to create individual rights. While Koroma claims that the statutory language focuses on eligible families' rights, that is not the case. (_Id._ at 6.) The Supreme Court has found private rights when statutes, such as Title VI of the Civil Rights Act of 1964 and Title IX of the Educational Amendments of 1972, were "phrased 'with an unmistakable focus on the benefited class." _Gonzaga_, 536 U.S. at 284 (citing _Cannon v. Univ. of Chicago_, 441 U.S. 677, 691 (1979)). Yet, an unmistakable focus on Section 8 eligible families is not present here.

Koroma correctly encourages the Court to consider the specific subsection, as required in _Blessing_, 520 U.S. at 342-43; however, when that is done, the statute fails under _Gonzaga_. Both the voucher and portability subsections of 42 U.S.C. § 1437f focus primarily on the duties and authority of both the Secretary of HUD and the PHAs, along with the eligibility requirements of families.[8] _See_ 42 U.S.C. §§ 1437f(o), (r). Under the portability subsection, only two of the seven provisions

---

[8]    For example, the subsection detailing the voucher program begins with: "[t]he Secretary may provide assistance to public housing agencies for tenant-based assistance using a payment standard established in accordance with subparagraph (B)."    42 U.S.C. § 1437f(o)(1)(A).    Additionally the bulk of § 1437f deals with the Secretary of HUD and the PHAs. _See id._ § 1437f.

arguably deal with the family and one of those addresses when a family may not port its voucher. See id. § 1437f(r).

Furthermore, 42 U.S.C. § 1437f regulates the expenditure of federal funds by HUD for low-income housing assistance. "[U]nless Congress 'speak[s] with a clear voice,' and manifests 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." Gonzaga, 573 U.S. at 281.

In Gonzaga, the Supreme Court held that there was no private right of action in the Family Educational Rights and Privacy Act of 1974 ("FERPA"). Id. at 276. FERPA prohibits federal funding to educational institutions that release education records to unauthorized people. Id. The plaintiff sued under § 1983, alleging a violation of FERPA for the unauthorized release of information about an investigation into his alleged sexual misconduct by a university official. Id. at 277. FERPA, of course, is spending legislation that directs the Secretary of Education to enforce particular conditions upon educational institutions. Id. at 279. Similarly, 42 U.S.C. § 1437f, including the portability subsection, primarily directs and provides guidelines for the Secretary of HUD on the administration of the low-income housing assistance. Therefore, there is no unambiguous by stated congressional intent to create a private right of action.

The provision on which Koroma relies, 42 U.S.C. §
1437f(r)(1)(A), provides that the recipient of tenant-based
assistance <u>may</u> receive assistance in another PHA's jurisdiction.
That statute, however, does not require that assistance to be
given. Indeed, the term "may" typically implies discretion.
<u>Jama v. Immigration & Customs Enforcement</u>, 543 U.S. 335, 346
(2005) (citing <u>Haig v. Agee</u>, 453 U.S. 280, 294 n.26 (1981)).
That implication is particularly appropriate when "may" is used
along with the term "shall". <u>Id.</u> The portability subsection on
which Koroma relies uses both terms, in different provisions, as
well as both terms in the same provision. 42 U.S.C. § 1437f(r).
Discretionary wording does not tend to imply the conferring of a
right, and thus cuts against the requirement of <u>Blessing</u> that
the provision must be in mandatory, not precatory, terms to
create a privately enforceable right. 520 U.S. at 340-41.

It is true, as Koroma argues, that the Supreme Court has
held that an amendment of the Housing Act of 1937 confers
individual rights which may be privately asserted. <u>Wright v.
Roanoke Redevelopment & Hous. Auth.</u>, 479 U.S. 418, 420 n.2
(1987) (holding that 42 U.S.C. § 1437a(a) confers private
rights). In <u>Wright</u>, plaintiffs brought suit for a violation of
the Brooke Amendment against a PHA that was overcharging for
utilities. <u>Id.</u> at 419. As a result, the PHA was violating the
maximum rent provision imposed by the Brooke Amendment, 42

U.S.C. § 1437a(a), of the Housing Act, because utilities are considered part of rent under the Housing Act.  Id.

The Supreme Court reversed the Fourth Circuit's decision that the rights of the tenants under the Brooke Amendment were only enforceable by HUD, id. at 422, 424, 431, finding that the Brooke Amendment unambiguously conferred "a mandatory [benefit] focusing on the individual family and its income," id. at 430. As explained above, however, the portability subsection of 42 U.S.C. § 1437f does not unambiguously confer such a benefit.

Koroma also relies on Wilder v. Virginia Hospital Association, 496 U.S. 498 (1990) to support his claim.  (Pl.'s Opp'n 10-11.)  In Wilder, the Supreme Court found private rights for medical personnel in a Medicaid statute that stated what a state medical plan must do in reference to the setting of reasonable rates.  496 U.S. at 501-02, 505, 517-18.  However, in Wilder, the Court cited particular legislative history that supported that a finding of congressional intent to create a privately enforceable right.  Id. at 517-18.  Koroma cites no such relevant legislative history in this case.  Nor is there any.[9]

---

[9]   Koroma also relies on Doe v. Kidd, 501 F.3d 348 (4th Cir. 2007),which dealt with the same subsection of the Medicaid statute as in Wilder, and the court found a private right of action under a different provision.  501 F.3d at 356.  Doe is not applicable here for the same reasons that Wilder is not applicable.

Koroma finally cites _Avanesova v. Housing Authority of Los Angeles_, No. 04-5588 (C.D. Cal. Dec. 20, 2004), wherein the court allowed the enforcement of rights under 42 U.S.C. § 1437f in an unpublished decision on a motion for summary judgment. That decision is distinguishable because the PHA in _Avanesova_ had sufficient funds, but continued to refuse to execute a HAP contract and refused to absorb the plaintiff's voucher. _Id._ at 2-3. In _Avanesova_, the initial PHA had rejected close to one hundred billing requests from the receiving PHA. _Id._ at 2. As a result, the receiving PHA assumed that the initial PHA would reject the billing request for the plaintiff's voucher and, therefore, refused to execute a HAP contract. _Id._ The court cited no reason for either PHAs' refusal to fund the voucher. _Avanesova v. Hous. Auth. of L.A._, No. 04-5588 (C.D. Cal. Dec. 20, 2004).

The controlling regulations set forth particular instances in which it is appropriate for a PHA to deny a family's request to move, refuse to accept billing, or refuse to absorb a family's voucher. _See_ 24 C.F.R. §§ 982.314(e)(1), .355; 2008 HUD Notice 5, 7. One of those reasons is insufficient funding. Id. § 982.355(d). The decision in _Avanesova_ did not consider those regulations. And, in any event, _Avanesova_ did not involve a PHA which made a decision not to absorb a voucher because of a lack of funds to do so. Nor did the decision in _Avanesova_. _See_

18

id. at 2. For those reasons, the decision in <u>Avanesova</u> is not persuasive.

In sum, it is rather clear that the statute on which Koroma relies in Count One does not create a private right of action. Nothing in the statutory text supports such an interpretation. Nor is there any legislative history bespeaking at all, much less clearly, that Congress intended to create such a right in enacting the portability provision in 42 U.S.C. § 1437(f). That being the case, the statute provides no predicate for asserting a claim under 42 U.S.C. § 1983.

## III. Count Two: The Brooke Amendment of the Housing Act of 1937

Koroma alleges that RRHA is violating the Brooke Amendment of the Housing Act of 1937, 42 U.S.C. § 1437a, because Koroma must pay rent that is more than thirty percent of his adjusted income. It is difficult to understand the predicate for Count Two, but it appears that Koroma there contends that, because RRHA did not absorb his voucher (and thus did not subsidize his rental obligation at all), he ended up paying more than thirty percent of his income for rent. That, says Koroma, violated the Brooke Amendment.

That argument, however, is nothing more than a recasting of the argument that RRHA violated the portability provisions by not absorbing him into its program. And, as set forth above,

there is no private right of action available to serve as the basis for such a claim. Thus, Count Two fails for that reason alone.

Koroma makes a rather strange argument in an effort to animate the Brooke Amendment. (Am. Compl. ¶¶ 60-63.) First, Koroma argues that, because part of the Brooke Amendment, 42 U.S.C. § 1437a(a)(3), has been incorporated into the voucher provisions of the Housing Act, 42 U.S.C. § 1437f(o), the Brooke Amendment also is "an integral part of [the] [F]ederal Housing Choice Voucher statute." (Pl.'s Opp'n 16-17; Am. Compl. ¶ 62.) From this point of departure, Koroma argues that the Brooke Amendment, as a whole, somehow is imbedded in the portability provision. It is true that a portion of the Brooke Amendment, 42 U.S.C. § 1437a(a)(3), is referenced in part of the voucher provisions of the Housing Act, 42 U.S.C. § 1437(o)(2), but that does not make the Brooke Amendment an integral part of the portability provisions.

Moreover, the provision of the Brooke Amendment, 42 U.S.C. § 1437a(a)(3), which is cited in the voucher provisions simply requires a PHA to charge participants a minimum monthly rental amount, regardless of income, unless the participant meets certain hardship requirements. Compare 42 U.S.C. § 1437f(o)(2), with 42 U.S.C. § 1437a(a)(3). That requirement addresses the

20

Secretary's obligations. It does not confer a private right of action.

Koroma would have the Court find that the mention of the Brooke Amendment in the voucher regulations operates to create individual rights of action in those provisions because the Supreme Court has found individual rights in a portion of 42 U.S.C. § 1437a. <u>Wright v. City of Roanoke Redevelopment & Hous. Auth.</u>, 479 U.S. 418, 419 (1987). In <u>Wright</u>, the plaintiffs lived in housing projects owned by the defendants, who were not complying with HUD regulations and overbilling the plaintiffs for their utilities. <u>Id.</u> at 419, 421. The tenant-plaintiffs brought an action under § 1983, alleging a violation of the Brooke Amendment, specifically 42 U.S.C. § 1437a(a) that imposes a rent ceiling. <u>Id.</u> at 419, 420 & n.2. However, that provision of the Brooke Amendment specifically excludes from its reach individuals who are Section 8 participants assisted under 1437f(o). Therefore, <u>Wright</u> does not support Koroma's position.

Lastly, Koroma cites <u>Johnson v. Housing Authority of Jefferson Parish</u>, 442 F.3d 356 (5th Cir. 2006), to support his claim that his rights have been violated under 42 U.S.C. § 1437f(o)(2). While, in <u>Johnson</u>, the Fifth Circuit found that Section 8 Housing Voucher participants do have a private right of action under § 1983 for a violation of 42 U.S.C. § 1437f(o)(2), the facts do not support a similar finding here.

21

_Id._ at 357-58. In _Johnson_, the plaintiff brought a § 1983 action against the local PHA that was administering their voucher for failing to properly calculate utility allowances. _Id._ at 358-89. As a result of this miscalculation, the plaintiffs were paying more than they were required to pay in rent. _Id._ at 359. The Fifth Circuit applied the _Blessing_ test and observed that 42 U.S.C. § 1437f(o)(2) is virtually identical to the statute that was at issue in _Wright_. _Id._ at 360. However, the present case is not about a PHA that is overbilling a participant, it is about a PHA that has declined to absorb a voucher from a portable family because the PHA does not have sufficient funds to do so. And PHAs are not required to absorb portable families. _See, e.g._, § 982.355(d).

Even assuming, _arguendo_, that there is a private right of action under 42 U.S.C. § 1437f(o), Koroma still has failed to state a claim. Koroma asserts that RRHA is depriving him "of his right to pay no more than [thirty percent] of his adjusted income as rent." (Am. Compl. ¶ 60.) However, RRHA is not required to fund Koroma's voucher at all, _see infra_ 25-27, and, under that circumstance, it is of no moment that Koroma must pay more than thirty-percent of his adjusted income for rent in non-Section 8 housing because his voucher was not funded for the reason that the PHA lacked funds. The rule in _Johnson_ applies

22

to people for whom a PHA has executed a HAP contract. That simply is not the case here.

Participants do not have an unfettered right under 42 U.S.C. § 1437f to move anywhere within the country and to continue to receive housing assistance payments, or vouchers, which would allow them to contribute only thirty percent of their monthly adjusted income towards rent, regardless of their location. First, the maximum payment standards are under the voucher subsection of the statute, 42 U.S.C. § 1437f(o), not the portability subsection, 42 U.S.C. § 1437f(r). While the regulations outline the PHA's authority to terminate a participant's benefits, 24 C.F.R. §§ 982.552, .553, the regulations also give a receiving PHA the choice to absorb, if it has enough funds to do so, or to bill the initial PHA for incoming vouchers, id. § 982.355 (d), (e). Additionally, an initial PHA can refuse to allow a family to port its voucher to a more expensive jurisdiction, if the initial PHA does not have enough funds to cover billing. Id. § 982.313(e)(1). Thus, the regulations clearly restrict a participant's ability to port a voucher.

If the statute is interpreted as Koroma argues, a Section 8 participant would have a claim against any PHA in the nation, unless it absorbed his voucher or the initial PHA (here CCHA) agreed to accept billing from the PHA in the area where the

participant decided to move. Neither the statute nor the regulations admit of such an interpretation.

For the foregoing reasons, Count Two fails to state a claim upon which relief can be granted, even if 42 U.S.C. § 1437f(o) confers a private right of action respecting the absorption of vouchers under the portability provision (which it does not).

## IV. Count Three and Five: Due Process Clauses of the Fourteenth Amendment of the United States Constitution and the Constitution of Virginia, Article I, Section 11

In Count Three, Koroma alleges a violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution. (Am. Compl. ¶ 64-65.) Additionally, he alleges a violation of the Due Process Clause of the Constitution of Virginia, Article I, Section 11 in Count Five. (Id. ¶ 68-69.)[10]

The Due Process protections under the Virginia Constitution are the same as the protections under the U.S. Constitution. Shivaee v. Commonwealth, 613 S.E.2d 570, 574 (Va. 2005) (citing Morrisette v. Commonwealth, 569 S.E.2d 47, 53 (Va. 2002) (citing Willis v. Mullet, 561 S.E.2d 705, 708 (Va. 2002))). Because Virginia "courts have consistently held that the protections afforded under the Virginia Constitution are co-extensive with

---

[10] Claims based on Virginia's Constitution are not actionable by way of § 1983 which is available only to redress violations of federal constitutional or statutory rights. It appears that Count Five is advanced under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

those in the United States Constitution," the Court will analyze Count Five under the same framework as it does Count Three. Caprino v. Commonwealth, 670 S.E.2d 36, 38 n.1 (Va. Ct. App. 2008) (citations omitted).

One is entitled to procedural due process before the deprivation of his liberty or property interests. Bd. of Regents v. Roth, 408 U.S. 564, 569. First, it is necessary to identify the "nature of the interest at stake." Id. at 570-71. Additionally, the plaintiff must "have a legitimate claim of entitlement to it." Id. at 576. While public assistance benefits are a right and a statutory entitlement for qualified people, Goldberg v. Kelly, 397 U.S. 254, 261-62 (1970), those rights are circumscribed by the statutes that define one's eligibility for them, Roth, 408 U.S. at 577.[11]

Koroma asserts that he has a property interest in his housing voucher. (Pl.'s Opp'n 20.) Although this is likely true, it is largely irrelevant to the present issue because under the applicable regulations, RRHA is not required to fund that voucher. Koroma's right to a voucher and that voucher's portability are circumscribed by the regulations contained within 24 C.F.R. pt. 982, including regulations that limit

---

[11] As discussed previously, as regards to Count One, the portability subsection, 42 U.S.C. § 1437f(r), does not create a statutory entitlement as it confers no private rights. See supra 12-19.

25

portability when the receiving PHA is not able to fund a putative transfer. 24 C.F.R. § 982.353(b). Those regulations operate to limit Koroma's property interest by vesting in the PHA an obligation not to absorb a voucher when it does not have funds to do so. Because of that limitation, the portability decision rests within the discretion of the PHA (subject, of course, to controlling regulations and law), and the Section 8 participant's property interest does not include an entitlement to absorption. Nor do the statute or the regulations give the Section 8 participant a role in the absorption decisional process. Accordingly, Koroma had no property interest to which a right of hearing attached, and thus RRHA did not violate any due process right by not giving Koroma a hearing before, or as part of, the decision that a lack of available funding foreclosed absorption of Koroma's voucher. For those reasons, Counts Three and Five fail to state a claim upon which relief can be granted.

Also, Koroma is in error when he argues that his voucher was terminated by RRHA and that he was, therefore, entitled to an administrative hearing. (Am. Compl. ¶¶ 64, 68.) However, under any of the relevant regulations or statutes, there has been no termination. See 42 U.S.C. § 1437f (o), (r); 24 C.F.R. pt. 982. As explained above, a PHA is not obligated to make housing assistance payments for a family until the PHA executes

a HAP contract on the family's behalf. 2008 HUD Notice 4.

Because a HAP contract was never executed on Koroma's behalf,

RRHA was never obligated to make housing assistance payments for

Koroma nor was Koroma ever absorbed into RRHA's jurisdiction.

Id. Therefore, assuming, _arguendo_, that Koroma has a property

interest in his voucher, RRHA was never required to fund it, and

the failure to fund does not mean that RRHA has terminated any

of Koroma's benefits.[12]

It is true that the refusal "to process or provide

assistance under portability procedures" is considered a

termination of benefits. 24 C.F.R. § 982.552(a)(3). However,

the refusal to absorb a voucher from an outside jurisdiction is

a permitted act and thus it is not a termination of benefits.

See _id._ § 982.552.

Consequently, RRHA did not refuse to process Koroma's

voucher nor to assist him. RRHA correctly issued a search

voucher to Koroma by converting a CCHA voucher when he wished to

lease a unit in its jurisdiction. _See id._ § 982.355(c). RRHA

---

[12] While a participant does not know for sure whether his
voucher will be absorbed until a HAP contract is executed, 24
C.F.R. § 982.311(d)(2) allows an overlap in rental assistance,
thereby allowing a participant to find a suitable home in
another jurisdiction and execute a HAP contract before giving up
rental assistance in the initial jurisdiction. _Id._ It is
unfortunate that Koroma did not use that regulation to avoid the
current situation. However, that failure does not somehow
obligate RRHA to fund his voucher.

simply decided not to absorb Koroma's voucher, which is an act that is within RRHA's discretion. Nothing in the statute or the implementing regulations requires a hearing before that discretion is exercised. Id. §§ 982.554(c)(1), .555(b)(1).

Koroma argues that RRHA cannot avoid administering the voucher, inspecting a suitable unit, and executing a HAP contract, even if it refuses to absorb the voucher. (Pl.'s Opp'n 24.) However, where, as here, a voucher cannot be supported by funds and the regulations foreclose absorption in the absence of funds, a PHA is not refusing to assist the participant or to administer the program. To the contrary, the PHA is acting as it is required to act under the program.

In addition, initial PHAs are required to administer their program in a way that ensures that they can cover the vouchers of those families that move under portability procedures. Id. § 982.355(e)(6). CCHA, the initial PHA, refused to accept billing in this case when notified in September 2009 that RRHA had insufficient funds. (Am. Compl. ¶ 42.) Koroma cites 24 C.F.R. § 982.314(e)(1) to argue that, if RRHA had told CCHA about its inability to absorb his voucher, then CCHA could have denied his move due to CCHA's lack of funds. (Pl.'s Opp'n 22.) That may be true, but nothing in those regulations or that conduct creates a property interest or constitutes the termination of one if it were to exist.

For the foregoing reasons, Count Three does not present a valid Due Process Claim against RRHA under the Fourteenth Amendment of the United States Constitution. Because Koroma does not have a Due Process Claim under the U.S. Constitution, he does not have one under the Virginia Constitution either. Cominelli v. Rector & Visitors of the Univ. of Va., 589 F. Supp. 2d 706 (W.D. Va. 2008). Hence, Counts Three and Five will be dismissed.

## V.   Count Four: Federal Common Law Promissory Estoppel

In Count Four, Koroma alleges that RRHA's refusal to absorb his voucher, after making an oral statement to him that it intended to do so, constitutes promissory estoppel. (Am. Compl. ¶ 66.) However, it is the general rule that estoppel does not usually operate against the sovereign, particularly not when dealing with payment of federal funds, and this case is not an exception to that rule. Therefore, Koroma may not rely on a claim of promissory estoppel.

As early as 1813, the Supreme Court held that estoppel does "not lie against the Government as it lies against private litigants." Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 419 (1990). To prevail on a claim of promissory estoppel against the federal government, one must show the traditional elements of estoppel as well as affirmative misconduct. See,

e.g., Dawkins v. Witt, 318 F.3d 606, 611-12 (4th Cir. 2003) (stating the plaintiff must satisfy the "traditional elements of equitable estoppel" as well as show affirmative misconduct by FEMA to prevail on its claim); United States v. Ledwith, 805 F. Supp. 371, 374 (E.D. Va. 1992); Joyner v. Garrett, 751 F. Supp. 555, 561 (E.D. Va. 1990). The traditional elements of federal common law promissory estoppel are: "(1) a promise, (2) which the promisor should reasonably expect to cause action by the promisee, (3) which does cause such action, and (4) which should be enforced to prevent injustice to the promisee." In re Peanut Crop Ins. Litig., 524 F.3d 458 (4th Cir. 2008) (citing C & K Petrol. Prods., Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir. 1988) (citations omitted)) (stating the elements of a claim of detrimental reliance); accord DeVoll v. Burdick Painting, Inc., 35 F.3d 408, 412 n.4 (9th Cir. 1997) (citing Aguilar v. Int'l Longshoremen's Union Local 10, 966 F.2d 443 (9th Cir. 1992)). Additionally, "the Court's decisions indicate that estoppel may only be justified, if ever, in the presence of affirmative misconduct by government agents." Dawkins, 318 F.3d at 611 (citing Immigration & Naturalization Serv. v. Hibi, 414 U.S. 5, 8 (1973) (per curiam) (citing Montana v. Kennedy, 366 U.S. 308, 314-15 (1961))); accord Schweiker v. Hansen, 450 U.S. 785, 788-89 (1981)(per curiam).

When Koroma expressed a desire to move to Virginia, CCHA told him to investigate whether the receiving PHA had either similar payment standards or would absorb his voucher. (Am. Compl. ¶ 27.) Subsequently, someone at RRHA told Koroma that RRHA intended to absorb his voucher. (Id. ¶ 28.) After Koroma submitted a Participant Portability Request to CCHA, CCHA submitted a portability request on Koroma's behalf to RRHA. (Id. ¶ 29.) RRHA responded and stated it intended to accept all portability requests received before October 1, 2009. (Id. ¶ 30; Am. Compl. Ex. 3.) Koroma asserts that he relied on both RRHA's oral statement to him over the phone and RRHA's written statement to CCHA. (Am. Compl. ¶¶ 34, 36.) Additionally, he asserts that RRHA should have expected him to rely on its statements that it would absorb his voucher, and his reliance was reasonable. (Id. ¶¶ 35, 37.)

It is doubtful that RRHA's statement of intent constitutes a promise within the jurisprudence of promissory estoppel. But, even if it be thusly considered, it is not a promise as to which RRHA reasonably should have expected Koroma to act as he did where, as here, the applicable regulatory procedures necessitated an inspection and an executed HAP contract before RRHA absorbed an incoming voucher. That is even more so where, as here, the search voucher told Koroma that those steps were a prerequisite to absorption. And, for the same reasons, it was

not reasonable of Koroma to act as he did and no injustice resulted to Koroma.

Assuming, _arguendo_, however, that the facts were to satisfy the traditional elements of promissory estoppel, Count Four, nonetheless fails as a matter of law because the Second Amended Complaint asserts no affirmative misconduct on the part of RRHA. While, the Supreme Court has observed that "some type of 'affirmative misconduct' _might_ give rise to estoppel against the Government," _Richmond_, 496 U.S. at 421 (citing _Hibi_, 414 U.S. at 8; _Schweiker_, 450 U.S. at 788; _Immigration & Naturalization Serv. v. Miranda_, 459 U.S. 14, 19 (1982) (per curiam); _Heckler v. Cmty. Health Servs. of Crawford County, Inc._, 467 U.S. 51, 60 (1984)) (emphasis added), it has yet to apply that principle to justify the application of estoppel, _id._ at 422 (The Court has "reversed every finding of estoppel that [it] has reviewed.").

Affirmative misconduct is most often defined by decisions that describe what does not fit the bill. _E.g._, _Schweiker_, 450 U.S. at 790 (erroneously telling the plaintiff she was ineligible for Social Security Benefits and not suggesting she fill out an application did not give rise to estoppel against the government); _Dawkins_, 318 F.3d at 612 (while it may be "unprofessional and misleading conduct" to re-open and continue to address a claim after the sixty-day deadline, it does not estop the government from asserting the defense that the

plaintiff submitted the claim after the deadline); <u>United States</u> <u>v. Agubata</u>, 60 F.3d 1081, 1083 (4th Cir. 1995) (failing to amend a deportation form to show the accurate and higher penalty for illegal entry into the United States is not affirmative misconduct); <u>Taneja v. Smith</u>, 795 F.2d 355, 358 (4th Cir. 1986)(assuming the INS acted carelessly in the handling of the plaintiff's sixth preference visa application, it was still not affirmative misconduct); <u>United States v. Lancaster</u>, 898 F. Supp. 320, 323 (E.D.N.C. 1995) (unauthorized representation does not rise to the level of affirmative misconduct). These decisions teach that to constitute affirmative misconduct, the actions at issue "must go beyond innocent or negligent misrepresentation." <u>In re Darden</u> 202 B.R. 715, 719 (Bankr. E.D. Va.,1996) (citing <u>United States v. Lancaster</u>, 898 F. Supp. 320, 323 (E.D.N.C. 1995)). RRHA's representation to Koroma that it intended to absorb his voucher certainly does not rise to the level of affirmative misconduct that is necessary to support the application of promissory estoppel.

Koroma urges the Court to endorse a complete ban on claims of estoppel against the government. However, Koroma does not cite, nor can the Court find, any authority for the view advocated by Koroma. In fact, Koroma does not cite a single case in which the facts warranted a decision of estoppel against the government.

The general unavailability of estoppel as a remedy against the government is moderated by the ability of Congress "to expand recoveries for those who rely on mistaken advice should it choose to do so." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). After the Court's decision in *Schweiker v. Hansen*, 450 U.S. 785 (1981), Congress did just that. 496 U.S. at 429. In the Budget Reconciliation Act of 1989, Pub. L. 101-239, § 10302, 103 Stat. 2481, Congress provided that claims not filed due to misinformation about benefit eligibility given by an agent of the Social Security Administration would be considered to have been filed on the date the misinformation was given or the date the applicant became eligible for benefits, whichever is later. *Id.* If Congress had wished, it could have included in the Housing Act of 1937 a similar provision; however, so far it has not. "Judicial adoption of estoppel based on agency misinformation would, on the other hand, vest authority in these agents that Congress would be powerless to constrain." *Id.*

For the foregoing reasons, Count Four is legally insufficient.

## CONCLUSION

For the reasons set forth above, the DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT (Docket No. 15) will be granted.

It is so ORDERED.

_____/s/_____ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April 27, 2010